Scott D. Tenley (Cal. Bar No. 298911)
*scott@tenleylaw.com*
**TENLEY LAW, P.C.**
2601 Main Street, Suite 850
Irvine, California 92614
Telephone: (949) 749-2300
Facsimile: (949) 520-6727

Attorneys for Defendant
CHRISTIAN CERNA CAMACHO

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTIAN CERNA CAMACHO,<br><br>Defendant. | No. 2:25-cr-00505-CV<br><br>**DEFENDANT CHRISTIAN CERNA CAMACHO'S SENTENCING POSITION**<br><br>Sentencing Date: March 25, 2026<br>Hearing Time: 3:00 p.m.<br>Location: Courtroom 10B |

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................1

I.      INTRODUCTION ...............................................................................................1

II.     PERTINENT EVENTS .......................................................................................2

        A.      Immigration Enforcement Operations in Los Angeles on June 6, 2025.......2

        B.      Immigration Protests in Paramount on June 7, 2025 ...................................2

        C.      Mr. Cerna's Arrest and Unconstitutional Interrogation ...............................6

III.    THE SENTENCING GUIDELINES CALCULATION ........................................9

        A.      The Plea Agreement and PSR ......................................................................9

        B.      The Government Has Waived its Objections to the PSR............................10

                1.      The Bodily Contact Enhancement Does Not Apply.........................11

                2.      The Zero-Point Offender Adjustment Applies ................................14

IV.     ARGUMENT.....................................................................................................15

        A.      Legal Standard...........................................................................................15

        B.      The § 3553 Factors Support a Sentence of Time Served...........................16

                1.      Mr. Cerna's History and Characteristics.........................................16

                2.      The Nature and Seriousness of the Offense.....................................18

                3.      Just Punishment.............................................................................20

                4.      Unwarranted Sentencing Disparities ..............................................21

                5.      Specific and General Deterrence ....................................................22

                6.      Protection of the Public.................................................................23

V.      CONCLUSION..................................................................................................23

# TABLE OF AUTHORITIES

**CASES**

*Gall v. United States*
    552 U.S. 38 (2007)................................................................................................16

*Nelson v. United States*
    555 U.S. 350 (2009)..............................................................................................16

*United States v. Bell*
    158 F.Supp.3d 906 (N.D. Cal. 2016)....................................................................15

*United States v. Booker*
    543 U.S. 220 (2005)..............................................................................................16

*United States v. Carty*
    520 F.3d 984 (9th Cir. 2008) ................................................................................15

*United States v. Lopez-Cavasos*
    915 F.2d 474 (9th Cir. 1990) ................................................................................10

*United States v. McKeiver*
    982 F. Supp. 842 (M.D. Fla. 1997) ......................................................................14

*United States v. Rivera-Alonzo*
    584 F.3d 829 (9th Cir. 2009) ................................................................................14

**STATUTES**

18 U.S.C. § 3553(a) ....................................................................................................16

Cal. Penal Code § 1001.36......................................................................................20, 21

**RULES**

Fed. R. Crim. P. 32(f)(1).............................................................................................10

Local Rule 32-3.2.........................................................................................................10

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendant Christian Cerna Camacho appears before this Court for sentencing after pleading guilty to the misdemeanor offense of simple assault on a federal officer, in violation of 18 U.S.C. § 111(a).  The offense occurred on June 7, 2025 in Paramount, California and arose out of community protests over ICE immigration raids that had commenced the day before in Los Angeles, California.  That day, Mr. Cerna was standing just feet away from Border Patrol agents who were arresting other protestors with unnecessary force and violence.  When one of the Border Patrol agents (Agent Eduardo Mejorado) lunged at Mr. Cerna, he reflexively and defensively swung his open hand at the agent in response, but did not make contact or cause any injury.  Border Patrol agents later shot Mr. Cerna in the face with a tear gas canister and detonated flash-bang grenades in close proximity to him and his brother in retaliation.  Several days later, Homeland Security agents executed a violent arrest of Mr. Cerna while he was driving with his partner and two young children, including crashing into his car, detonating flash-bang devices, and pointing assault rifles at him and his family.  Once Mr. Cerna was in custody, Agent Mejorado – who had no operational justification for participating in the arrest – conducted an unconstitutional interrogation of Mr. Cerna in violation of *Miranda*, all with Department of Homeland Security's media team standing in tow.

The Court should impose a sentence of time served and a special assessment of $25.  Mr. Cerna stands convicted of a misdemeanor causing no injury or damage; his offense level is 6; he is a zero-point offender; and his Guidelines range is 0-6 months' imprisonment.  He is plainly among the small group of federal defendants who deserve the most lenient sentences.  To date, Mr. Cerna has experienced significant consequences as a result of the offense, in terms of both immediate punishment and longer-term psychological effects.  He spent seven days in custody and two months in home detention.

1

████████████████████████████████████████████.  Moreover, Mr. Cerna's uncharacteristic reaction to immigration officials can be traced directly back to the emotional trauma he suffered as a young boy when his father was deported by immigration officials, throwing his childhood into upheaval.  A sentence of time served is sufficient, but not greater than necessary, to meet the goals of sentencing under 18 U.S.C. § 3553.

## II.    PERTINENT EVENTS

### A.    Immigration Enforcement Operations in Los Angeles on June 6, 2025

Beginning in January 2025, the Trump administration put into place an aggressive plan to detain and deport undocumented immigrants living in the United States.  On January 20, 2025, the President of the United States signed an executive order directing the Department of Homeland Security (DHS) to use all legally available tools to detain and remove noncitizens present in violation of federal law, reflecting a broad "mass deportation" framework rather than a narrower priority-based approach.[1]  These new policies were enforced in Los Angeles, California by at least June 6, 2025, when federal agents executed search warrants at multiple businesses suspected of employing undocumented workers and falsifying employment records.  These enforcement actions quickly triggered public demonstrations where those raids occurred and outside of federal buildings in Los Angeles.

### B.    Immigration Protests in Paramount on June 7, 2025

The day after widespread protests in Los Angeles, word spread that federal officials were conducting immigration sweeps targeting day laborers at Home Depot in Paramount, California.  Indeed, immigration officials were preparing for a large-scale enforcement operation dubbed "Operation Alley Cats."  Declaration of Scott D. Tenley ("Tenley Decl.") Ex. 1.[2]  According to the Operations Order Report, immigration officials planned

---

[1]  *See*  https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/ (last accessed March 15, 2026).

[2]  Unless otherwise noted, all references to "Ex." refer to exhibits attached to the Tenley Declaration.

2

to "conduct counterfeit inspections and consensual encounters with 90-100 vendors [and] additional encounters at the Santee Alley Marketplace" that day. *Id.* at 2. The primary objective, however, was immigration arrests: federal agents were directed to "identify and detain persons in violation of federal immigration laws and maintain strict traffic and crowd control to prevent civilian injuries." *Id.* Approximately 120 Border Patrol Agents were assigned to the operation, under the command of Gregory K. Bovino, who later became the face of immigration enforcement activity in Chicago and Minneapolis. *Id.* at 2, 4.

When Paramount residents heard of alleged immigration sweeps at Home Depot, protestors amassed outside of HSI offices at 6321 Alondra Boulevard, just a quarter-mile from Home Depot. PSR ¶ 10. Because of the pending immigration sweep in Santee Alley, several dozen Border Patrol agents were in the vicinity and began arriving at the HSI office. Protestors then started blocking traffic in the intersection immediately outside of the office in an effort to thwart immigration enforcement activity.

After hearing the rumors about Home Depot sweeps and the gathering of protestors just a few blocks from his home, Mr. Cerna drove to the gates of the HSI office and verbally confronted immigration officials in statements that admittedly approached the boundaries of protected First Amendment activity (and which he regrets). PSR ¶ 11. As more protestors amassed in front of the gate, including some laying down in the streets, immigration officials made the collective determination to clear the point of entrance and egress. *See* Ex. 2. Because Mr. Cerna's car was partially impeding access to the office parking lot, agents ordered Mr. Cerna to move his car and leave. One of the two agents addressing Mr. Cerna shoved him violently. *Id.* at 0:04-0:05. As this happened, Special Agent Eduardo Mejorado ran toward the confrontation, attempting to inject himself into the situation. *Id.* at 0:07-0:08. Mr. Cerna complied with the directive and drove away from the protest location, later returning on foot.

By the time Mr. Cerna had returned on foot, tensions had continued to rise among protestors of immigration agents. At some point, two women were arrested for blocking

Border Patrol vehicles. Dkt. No. 1 at ¶ 9. In the moments preceding the assault at issue in this case, another protestor (dressed in a black shirt and later identified as Brayan Ramos-Brito) got into a confrontation with an immigration agent. Ex. 4; PSR ¶ 12. The agent (who was much larger than Mr. Ramos-Brito) violently shoved Mr. Ramos-Brito. *Id.* at 0:20. When Mr. Ramos-Brito held his ground, several agents pulled him to the ground, got on top of him, and began to use what appeared to Mr. Cerna to be excessive force. *Id.* at 0:23; *see also id.* at Ex. 5 at 0:17, 0:24, 0:39; *see also id.* at Ex. 7 (video of agents dragging Mr. Ramos-Brito over the pavement); Ex. 15 at 3 (describing agents using force and putting their knees on the heads of protestors).

During Mr. Ramos-Brito's violent arrest, Agent Mejorado focused his attention primarily on Mr. Cerna, repeatedly reaching toward Mr. Cerna and attempting to gain wrist control. *Id.* at 0:32; *see also* Declaration of Jordan Cerna ("Jordan Decl.") ¶ 6 (describing agents' attempts to pull him to the ground).[3] Mr. Cerna retreated several feet to avoid Agent Mejorado's grasp. Ex. 4 at 0:33. As Mr. Cerna approached again, Agent Mejorado *twice* grabbed at Mr. Cerna, including immediately before Mr. Cerna swung his arm. *Id.* at 0:42-0:46. At that point, Mr. Cerna – a trained boxer – instinctively executed a "check hook," which is a defensive maneuver boxers are taught to create distance from an advancing, aggressive opponent. Declaration of Tyrell Washington ("Washington Decl.") ¶ 7; Ex. 15 at 7; Ex. 4 at 0:44; PSR ¶ 13. Body worn camera shows Mr. Cerna *backing away* from Agent Mejorado's outstretched arm immediately before defensively swinging his own arm toward Agent Mejorado with an open hand. Ex. 5 at 1:09-1:14.

Agent Mejorado and others began running toward Mr. Cerna, causing him to briefly retreat to avoid a violent confrontation like the one Mr. Ramos-Brito had been subject to. Ex. 4 at 0:46. Just thirty seconds later, Mr. Cerna is captured walking a few feet from the site of the altercation, where he sits on the sidewalk and drinks water. *Id.* at 1:11, 1:34. Mr. Cerna did not "flee the scene" in such a way as could be interpreted as consciousness

---

[3] To avoid confusion, Jordan Cerna is respectfully referred to by his first name.

4

of guilt, but instead was removing himself from potential violence at the hands of Agent Mejorado and others. Tear gas, or other chemical irritant had been deployed by that point as well. *Id.* at 0:43 (smoke trail in upper left of video); 0:50-0:54 (visible smoke); 1:23. Mr. Cerna changed his clothing that was covered in chemical irritants and later returned to the protest. PSR ¶ 14.

Moments later, Chief Gregory Bovino addressed Border Patrol officers. Ex. 3 at 7:08. He told the assembled agents, "Arrest as many people that touch you as you want to. Those are the general orders all the way to the top. Everybody fuckin' gets it if they touch. You here what I'm sayin'?" *Id.* at 7:21. He concluded by advising the assembled Border Patrol agents – the majority of whom were stationed in Imperial County, California along the Mexican border – "This is our fuckin' city!" *Id.*

Chief Bovino made the directive clear to Border Patrol agents that (in the view of the defense) motivated Agent Mejorado to wrongly claim that Mr. Cerna had made contact with him: if you want to arrest a protestor, they have to make contact with you first. It was widely publicized that Chief Bovino went on to lead violent and unconstitutional immigration enforcement activity in Chicago and Minneapolis. In fact, Chief Bovino *himself* admitted in a November 2025 deposition to lying about being hit with a rock before deploying tear gas on protestors. *Chicago Headline Club, et al. v. Kristi Noem, et al.*, --- F. Supp. 3d ----, 2025 WL 3240782, at *6 (N.D. Ill. Nov. 20, 2025) ("Most tellingly, Bovino admitted in his deposition that he lied multiple times about the events that occurred in Little Village that prompted him to throw tear gas at protesters.") *vacated on other grounds and appeal dismissed at* --- F.4th ----, 2026 WL 622677 (7th Cir. Mar. 5, 2026).

When Mr. Cerna returned to the demonstrations, law enforcement agents recognized him from earlier and targeted him for unconstitutional violence even though he posed no immediate threat to them. An agent shot a tear case cannister at Mr. Cerna and struck him in the face. Jordan Decl. ¶ 9; Tenley Decl. Ex. 6 (visible gash under left eye); Ex. 15 at 4. This type of behavior is not out of the ordinary for ICE and Border Patrol Agents. Orange County resident Britain Rodriguez was blinded in one eye after he

was shot with a less-lethal round during immigration protests in Santa Ana, California.[4] Another man was shot at point-blank range in the eye, also leaving him blind in one eye, during the same protest.[5] When Mr. Cerna and Jordan fled from the incoming projectiles, an agent shot a flash bang-type device at them that detonated in close proximity to them. Jordan Decl. ¶ 9.

Returning to the confrontation at issue in this case, Agent Mejorado suffered no injury as a result of what he described as a punch to the right side of his face from Mr. Cerna's left fist. Ex. 8 (statement from Agent Mejorado: "After asking CERNA to back away he lunged forward and swung his left fist striking me on the right side of face.") He was not treated for any injuries, taken to the hospital, or taken off of the frontlines during the protest. He did not prepare or participate in any type of post-action reporting. He did not even claim or document any marks on his face that were caused by the alleged "punch."[6] That is because Agent Mejorado was never punched in the face and video evidence confirms it.

### C.   Mr. Cerna's Arrest and Unconstitutional Interrogation

After obtaining a federal arrest warrant for Mr. Cerna, HSI developed a plan to arrest Mr. Cerna with assistance from their Special Response Team ("SRT"), the federal equivalent of a SWAT Team. The arrest plan called for an eight-member SRT team to carry out the arrest, with support from HSI field agents from the Orange County and Long Beach resident offices. Ex. 9, 10. Border Patrol, as an agency, was not identified as a

---

[4] https://www.latimes.com/california/story/2026-01-16/second-man-says-homeland-security-blinded-him-at-anti-ice-rally (last accessed March 15, 2026).

[5] https://www.ocregister.com/2026/01/14/no-reasonable-explanation-for-homeland-security-officer-shooting-santa-ana-protester-in-the-face-blinding-an-eye-expert-says/ (last accessed March 15, 2026).

[6] The government has taken the position that Agent Mejorado claims he was "sucker punched," which according to the prosecutor is any type of strike, no matter how small, that emanates from an unexpected direction. But the record is clear that Agent Mejorado has repeatedly stated that he was *punched* in the face (*see, e.g.*, Tenley Decl. Ex. 8; Dkt No. 1 at ¶ 14-15) – a statement that cannot be squared with the video evidence in this case.

participant in Mr. Cerna's arrest, nor was Agent Mejorado identified as a participant in the planned arrest. *See id.* at Ex. 10.

The "primary objective" of the arrest plan was "to ensure the safe execution of a federal arrest in or near the subject's vehicle[.]" *Id.* According to the arrest plan, SRT agents, divided into four vehicles, would position at a strategic location near Mr. Cerna's residence in Paramount. One vehicle would serve as a "mobile command platform," and monitor Mr. Cerna's movements "from the residence to his vehicle," using a drone. *Id.* According to the plan, "Should [Mr. Cerna] reach his vehicle before being intercepted by SRT and go mobile, the [drone] operator will track the vehicle and coordinate with the SRT [Team Leader] to identify a tactically sound location – preferably away from residential areas – at which to conduct the vehicle take-down." *Id.* The Arrest Plan also identified "Reasons to Abort or Delay Arrest," which included, in relevant part: if Mr. Cerna was "located in a high-traffic area with numerous civilians in close proximity" or "in his vehicle with a minor child and is acting erratic." *Id.*

On the morning of June 11, 2025, HSI agents conducted surveillance at Mr. Cerna's residence, causing them to observe Mr. Cerna leaving his home with his partner and two young children. *See* Ex. 9 On his way to visit family in Boyle Heights, Mr. Cerna drove to a nearby gas station where he refueled his car and played with his children through the backseat window, both of whom were plainly visible to surveilling law enforcement agents. As Mr. Cerna and his family were in transit, SRT operators armed themselves with handguns, rifles, and flash-bang grenades to effectuate the arrest. Ex. 11.

After refueling, Mr. Cerna drove to the 710 Freeway toward Boyle Heights and, according to HSI (though denied by Mr. Cerna), began driving "erract[ically]." Ex. 9. When coupled with the presence of his young children, this should have caused HSI to abandon its arrest plan. *See id.* at Ex. 10. Nevertheless, after Mr. Cerna took the Calzona Street exit and turned onto Whittier Boulevard, SRT operators in two vehicles intentionally crashed into Mr. Cerna, pinning him between their vehicles. *Id.* at Ex. 10, 12 (video); PSR ¶ 16. This maneuver is known as a Precision Immobilization Technique,

7

or PIT.  *Id.*  One of the two SRT SUVs crashed into the rear passenger side of Mr. Cerna's vehicle where his two young children were strapped into their car seats.  *See* Ex. 12; *see also* Ex. 17 (*Los Angeles Times* article regarding arrest).

Immediately after executing the PIT maneuver on Mr. Cerna's car, four SRT agents emerged from their SUVs with guns drawn.  Ex. 12, 13; *see also* Ex. 15 ("[Mr. Cerna] recalled thinking, 'Don't pull the trigger . . . cause I have my daughter sitting right behind me.'").  Several flash-bang grenades were activated toward the driver's side of the vehicle.  Ex. 12 at 0:17-0:19.  When Mr. Cerna got out of the car, with his hands raised in the air cooperatively, he told the agents, "Kids; I've got kids in the car."  Ex. 13 at 0:17-0:19.  An HSI agent responded, "Shut the fuck up!"  *Id.* at 0:19-0:20.  With guns pointed at him, Mr. Cerna followed agents' instructions and walked toward an SRT SUV, away from his family and vehicle.  *Id.*  He was then placed in handcuffs, with firearms drawn throughout.  *Id.*  As Mr. Cerna was arrested, agents kept their assault rifles trained on Mr. Cerna's partner, Abigail, and their two young children.  *Id.* at 0:47 (after Mr. Cerna is handcuffed, an agent calls out "Keep your hands up. Keep your hands up.  That's fine.  Keep your hands up.").

Agent Mejorado, wearing a vest identifying him as "U.S. Border Patrol," approached Mr. Cerna as he was being handcuffed, and lingered next to him.  *Id.* at 0:39.  He appears to have worn the same beige face covering that he wore at the June 7 Paramount protest.  Once Mr. Cerna was handcuffed, Agent Mejorado began a confrontational interrogation of Mr. Cerna:

MEJORADO:    Do you remember Saturday?

CERNA:    Yes, I remember Saturday, when you put your hands on me.  I have video of everything.

[Agent patting down Mr. Cerna, who is handcuffed]

MEJORADO:    Do you remember me?

CERNA:    Yes, I remember you.  When you pushed on me.  You pushed me.

8

*Id.* at 1:09.  Agent Mejorado continued to press Mr. Cerna, though his specific questions are inaudible.  *Id.*  Mr. Cerna was *not* Mirandized prior to this exchange.[7]  Agent Mejorado's behavior – violating Mr. Cerna's constitutional rights and aggressively challenging Mr. Cerna while cuffed – is consistent with his targeting of Mr. Cerna on June 7 and reflects a cavalier approach to law enforcement.  *See* Jordan Decl. ¶ 8; Tenley Decl. Ex. 2 at 0:04-0:05; Ex. 15 at 3 (Mr. Cerna describing an agent shadow him "like a linebacker").

## III.    THE SENTENCING GUIDELINES CALCULATION

### A.    The Plea Agreement and PSR

In the plea agreement the parties stipulated to a base offense level of 10 pursuant to USSG § 2A2.4(a) and reserved the right to argue that other specific offense characteristics and adjustments applied.  Dkt. No. 69 at ¶ 15.  The PSR concurs with the parties' stipulated base offense level and found that no other specific offense characteristic applies.  PSR ¶ 24-26.  Critically, the Probation Officer expressly found that a three-level enhancement for an offense involving physical conduct <u>*did not*</u> apply because the video evidence does not establish that Mr. Cerna's hand made contact with Agent Mejorado's face.  PSR ¶ 26. The PSR also found that Mr. Cerna is entitled to a two-level reduction as a zero-point offender under USSG § 4C1.1.  PSR ¶ 33.  Accordingly, the resulting Guidelines calculations are as follows:

| | | |
|---|---|---|
| Base Offense Level: | 10 | USSG § 2A2.4(a) |
| Acceptance of Responsibility: | -2 | USSG § 3E1.1(a) |
| Zero-Point Offender: | <u>-2</u> | USSG § 4C1.1 |
| **Total Offense Level:** | **6** | |

---

[7] There is no question this was custodial interrogation triggering *Miranda*.  Mr. Cerna had been violently arrested, held at gun point, and handcuffed.  And Agent Mejorado asked questions designed to elicit an incriminating statement about Mr. Cerna's presence at the June 7, 2025 protest.

In Criminal History Category I, with an offense level of 6, the Guidelines Range is 0-6 months' imprisonment.

### B.    The Government Has Waived its Objections to the PSR

The PSR was disclosed on February 20, 2026.  Dkt. No. 78.  Neither party filed written objections to the PSR within fourteen days of its disclosure, as required under Federal Rule 32(f).[8]  Notwithstanding its failure to file written objections, the government has raised objections in its sentencing position (Dkt. No. 82 at 7-9) and will likely do so at the hearing as well.  Those objections, however, are waived and the Court should not entertain them.

Rule 32(f)(1) is clear and unequivocal.  Any party with objections to the PSR must file those objections with the Court "[w]ithin 14 days after receiving the presentence report."  Fed. R. Crim. P. 32(f)(1).  The Local Rules of this Court emphasize the mandatory nature of the requirement for timely written objections: "Counsel must *observe strictly* the requirements of F. R. Crim. P. 32(f) regarding objections to presentence reports."  Local Rule 32-3.2 (emphasis added).  Here, the government has failed to file written objections and the Court should decline to consider any subsequent objections the government has or may submit in writing or at the sentencing hearing.  *United States v. Lopez-Cavasos*, 915 F.2d 474 (9th Cir. 1990) (affirming district court's determination that government's failure to file pre-sentencing written objections to proposed fine resulted in waiver of any further right to argue that objection at sentencing).

When Mr. Cerna raised Rule 32(f) with the government, the government described Mr. Cerna's position regarding compliance with the rule as "very cute" and suggested it had "good cause" under Rule 32(i)(1)(D) for any belated objections.  The government did not articulate any good cause for its delayed objections but references in its sentencing filing some non-specific "custom" to ignore the plain language of the Rules.  But the government's "custom" cannot override Rule 32 or Local Rule 32.3-2 requiring strict

---

[8] Mr. Cerna did not file written objections to the PSR because he has none.

observation of the requirements for written objections to the PSR. Indeed, by waiting to file its objections, the Court is deprived of the USPPO's response to its objections and Mr. Cerna is only afforded one day to respond to them. Under these circumstances, the Court should find that the government has waived its right to object to the PSR and adopt the Guidelines-related findings of Probation.[9]

To the extent the Court permits the government to present untimely objections, Mr. Cerna provides argument regarding the two objections presented by the government: (1) whether the bodily contact enhancement should apply; and (2) whether the zero-point offender reduction should apply.

1.      The Bodily Contact Enhancement Does Not Apply

The Court should adopt the PSR's finding that the bodily contact enhancement does not apply. *See* PSR ¶ 26; *see also id.* at ¶ 13. Mr. Cerna concurs with the Probation Officer that the primary video of the incident (Ex. 4) does not show that Mr. Cerna made contact when he swung his arm at Agent Mejorado. Other evidence in the record confirms that conclusion.

First, Mr. Cerna has submitted a computer-assisted analysis of the primary video of the swing. Declaration of Matthew Lewis at Ex. 22. This model was created by a Los Angeles-based image technologist with significant expertise in complex production technology. *Id.* at ¶ 2. To generate this video model, Exhibit 4 was digitally analyzed, with the benefit of precise measurements of Mr. Cerna's height and arm length. *Id.* at ¶ 4-5. Through this computerized video analysis, the Court is able to observe the interaction between Mr. Cerna and Agent Mejorado from all angles and from a closer distance. As the video analysis shows, Mr. Cerna could not have made contact with Agent Mejorado

---

[9] The government's attempt to suggest that defense counsel follows some "custom" with respect to PSR objections (Dkt. No. 82 at n.4) is not well taken (and has since been withdrawn). In *United States v. Perez*, No. 8:18-cr-000-53, Judge Kato *expressly ordered* the parties to file their PSR objections with their sentencing positions (Dkt. No. 220). In other cases, objections have been filed within 14 days of issuance of the PSR as required by Rule 32. *See, e.g., United States v. Marco Perez*, No. 2:23-cr-00476-FLA (Dkt. No. 29); *United States v. Chen*, No. 2:24-cr-00076-HDV (Dkt. No. 187); *United States v. Dominguez*, No. 8:23-cr-00167-JHW (Dkt. No. 239).

11

based on their physical position at the time of the swing. This computer-generated demonstrative should is objective, data-driven evidence supporting the finding in the PSR.

Second, Mr. Cerna's brother, Jordan, was standing directly behind Mr. Cerna when the confrontation occurred and had a clear view of what happened. Jordan Decl. ¶ 3. Jordan could see that Mr. Cerna's hand did not make contact with Agent Mejorado. *Id.* at ¶ 7. He also did not observe any visual indications from Agent Mejorado that contact occurred such as distortion of the face or mask, or a head turn from a blow. *Id.* Jordan was also filming with his camera at the time of the confrontation with Agent Mejorado. *Id.* at Ex. 20. Jordan's video recording, albeit brief, is strong evidence that no contact occurred, especially when view in slow motion (*id.* at Ex. 21). Mr. Cerna's open hand can be seen moving from left to right in one frame, as depicted below. *Id.* at 0:17.



As Mr. Cerna's hand comes through, Agent Mejorado's head moves *backward*, not to the side as would be expected if there was a blow to the face. *Id.* at 0:17-0:19. Agent

12

Mejorado's body moves backward and slightly up, as if he is avoiding Mr. Cerna's hand.[10] Additionally, the video shows that Agent Mejorado appears to have reacted with excitement that he had a basis – whether truthful or not – to arrest Mr. Cerna: by claiming that he had been struck on the right side of his face. *Id.* at 0:21. That is what Gregory Bovino had advised Border Patrol Agents. Tenley Decl. Ex. 3 at 7:21 ("Everybody fuckin' gets it if they touch.")

Tyrell Washington, a professional boxer, has reviewed the video evidence in this case. Washington Decl. ¶¶ 2-5. He has thousands of hours of experience in reviewing video recordings of fights and punches. *Id.* at ¶ 3. In his professional opinion, no contact occurred. *Id.* at ¶ 6 ("I do not see any contact made by Christian's left hand as it swings toward the officer . . . Christian was not close enough to connect with the officer even with Christian's arm fully extended.")

Finally, Agent Mejorado has never stated under oath, or been subject to cross-examination about, what happened on June 7, 2025. His statements on this issue are limited to email communications to and conversations with the case agent. And, with respect to his email communications (Ex. 8), his written statements are contradicted by the video evidence. There is no physical evidence of any contact occurring, such as photographs or physical marks. To the defense's knowledge, there are no other law enforcement agents who have corroborated Agent Mejorado's account in any way. Put simply, Agent Mejorado's statements are not credible and the Court should not find that contact occurred.

The government also contends (in a waived argument) that the Court should apply the physical contact enhancement because Mr. Cerna admitted he made "at least some contact" with Agent Mejorado. ECF 82 at 9. To the extent there is contact between Agent Mejorado and Mr. Cerna leading up to the swing, it is initiated by Agent Mejorado, not

---

[10] Based on this video, there is simply no way Agent Mejorado could claim with any credibility that Mr. Cerna "swung his left fist striking me on the right side of face." Ex. 8 at USAO_000112. If any contact occurred (which it did not), it was incredibly slight.

Mr. Cerna, and Mr. Cerna merely attempts to shake off the unwanted contact.  Ex. 4 at 0:32-0:46.  Courts have found that officer-initiated contact cannot form the basis of a physical contact sentencing enhancement.  *United States v. McKeiver*, 982 F. Supp. 842, 846 (M.D. Fla. 1997) ("[A] sentencing court may enhance a defendant's sentence by applying U.S.S.G. § 2A2.4 (b)(1) based on defendant-initiated physical contact, but not based on victim-initiated physical contact.")  When Mr. Cerna was unconstitutionally induced to make statements to law enforcement officers, he had no knowledge or understanding of the Sentencing Guidelines and was not making an admission to contact that would support a sentencing enhancement, as the government seems to suggest.[11]

### 2.    The Zero-Point Offender Adjustment Applies

The government has also argued that the Zero-Point Offender reduction does not apply.  The PSR correctly concluded that Mr. Cerna is entitled to this two-level reduction.  PSR ¶¶ 33-34.  The argument that Mr. Cerna cannot qualify for the adjustment because he "use[d] violence or credible threats of violence in connection with the offense" should be rejected.  The Ninth Circuit has adopted the traditional common law understanding of simple assault, which is either (1) a willful attempt to inflict injury upon the person of another, also known as an attempt to commit a battery, or (2) a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.  *United States v. Rivera-Alonzo*, 584 F.3d 829, 833 (9th Cir. 2009).  It is an assault that does not involve physical conduct.  *Id.* at 834.

Simple assault does not involve "violence" or threatened "violence" as those terms are understood under the Guidelines.  For example, in *United States v. Bell*, 158 F.Supp.3d

---

[11] The Court should also decline to use Mr. Cerna's post-arrest statements against him because they were obtained in clear violation of *Miranda*.  While that issue was not litigated because of the guilty plea, and the law does not prohibit the Court from considering a statement obtained in violation of the Constitution, the Court should exercise its discretion to excise it from the sentencing analysis.

14

906 (N.D. Cal. 2016), the district court found that felony assault on a federal officer was not categorically a crime of violence. *Id.* at 913-14. As the *Bell* court explained:

> In *United States v. Dominguez–Maroyoqui*, the Ninth Circuit considered whether a prior version of the section 111(a) felony qualifies as a crime of violence for the purposes of U.S.S.G. § 2L1.2.5 748 F.3d at 919. Applying the categorical approach and the *Johnson I* definition of physical force, the court of appeals held that the section 111(a) felony does not "ha[ve] as an element the use, attempted use, or threatened use of physical force against the person of another," because while the section 111(a) felony requires "at least some form of assault," it does not require that "any particular level of force be used." *Id.* at 921 (internal quotation marks omitted). "To obtain a section 111(a) felony conviction, then, the government need not prove, and an adjudicator need not find, that the offense involved violent force capable of causing physical pain or injury." *Id.*

*Id.* Applying that reasoning here, Mr. Cerna's offense did not include the type of conduct that was capable of causing physical pain or injury and his conviction for simple assault does not require the Court to find otherwise.

Likewise, Mr. Cerna's statements do not constitute "credible threats of violence" where he was standing in front of a phalanx of heavy armed federal agents without any weapons or ability to cause any harm. None of the agents reacted to these statements in a way that would suggest they found any of Mr. Cerna's statements to constitute a "credible threat" of violence.

## IV.    ARGUMENT

### A.    Legal Standard

All sentencing proceedings must begin with the calculation of the applicable Sentencing Guidelines range, which becomes the "starting point" for the district court's analysis. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (quoting *Kimbrough v. United States*, 552 U.S. 85, 109 (2007)). With that benchmark in mind, the

"overarching statutory charge" to the district court is to "impose a sentence sufficient, but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Id.* (internal quotation of 18 U.S.C. § 3553(a) omitted). The district court should also consider other factors identified in § 3553(a) including the kinds of sentences available, the need to avoid unwarranted sentence disparities among similarly situated defendants, and the need to provide restitution to victims. *Id.* (citing § 3553(a)(1)-(7)); *see also United States v. Booker*, 543 U.S. 220, 264 (2005). The Court's ultimate duty is to ensure that the sentence imposed "is appropriate for the individual defendant in light of the statutory sentencing factors." *Nelson v. United States*, 555 U.S. 350, 351 (2009). This includes consideration of a non-custodial sentence because "§ 3553(a)(3) directs the judge to consider sentences other than imprisonment." *Gall v. United States*, 552 U.S. 38, 59 (2007).

**B.    The § 3553 Factors Support a Sentence of Time Served**

Mr. Cerna respectfully submits that the § 3553(a) factors support a sentence of time served, with no supervision to follow, and a special assessment of $25. While Mr. Cerna respects the Probation Officer's recommendation, it is Mr. Cerna's position that no further supervision (including through a term of probation) is necessary here. Mr. Cerna has completed nine months of pretrial supervision without incident. This is a misdemeanor offense of simple assault with no injury, committed by a zero-point offender. A sentence that includes an additional period of supervision is greater than what is necessary to achieve the goals of sentencing.

### 1.    Mr. Cerna's History and Characteristics

Mr. Cerna's personal history and characteristics – including those which can be connected directly to the offense conduct – weigh strongly in favor of the recommended sentence. As the Supreme Court has explained, the purpose of the statutory sentencing scheme is to view "every convicted person as an individual and every case as a unique

16

study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 552 U.S. at 52. Nothing within Mr. Cerna's history and characteristics suggests that a sentence of incarceration or probation is necessary here.

Mr. Cerna is a committed father with two young children, ages three and one. PSR ¶ 56. He is an active and engaged parent who fosters and encourages his children's interests. *See id.* (describing trips to the aquarium with his son who loves fish). He is a loving and supportive partner to his long-time partner (and future wife) Abigail. Mr. Cerna is close to his siblings and his parents. He is also a skilled worker, with expertise in carpentry related to large structures like bridges and stadiums. When this case concludes, he hopes to return to that work full-time and to support his family through his labor.

██████████████. At the age of 12, Mr. Cerna came home from school on Friday afternoon to learn that his father had been taken into immigration custody and would be deported. PSR ¶ 53. Mr. Cerna was deeply affected, barricading himself into a room for hours and inconsolable. *Id.* As a result of that deportation, Mr. Cerna and his family had to relocate to an uncle's home in Long Beach, and he did not attend school for a year because of this upheaval. *Id.* at ¶ 54. ████████████████████ and incidents where his family would be stopped and asked for their "papers." PSR ¶ 52.

While parental deportation does not justify or excuse the offense, it provides important perspective regarding Mr. Cerna's reaction to Border Patrol agents conducting immigration enforcement activity just two blocks from his home. As Dr. Azcarraga explains:

17



Ex. 15 at 27.

### 2.    The Nature and Seriousness of the Offense

Mr. Cerna recognizes that assaulting or impeding a federal agent in the performance of his or her duties is a serious offense.  That said, there are powerful mitigating

18

circumstances with respect to this offense that render the recommended sentence appropriate.

- Mr. Cerna's conduct is aberrational. He has no history of violence or antagonism toward law enforcement. In fact, after his arrest, he expressed support and admiration for law enforcement.

- His conduct was prompted by unexpected and triggering events: reports of immigration sweeps and deportations just blocks from his home after having his own father deported when he was a young boy.

- There is substantial evidence that the offense conduct was defensive in nature and instinctive. Washington Decl. ¶ 7; Ex. 5 at 1:09-1:14 (Mr. Cerna rocking backwards away from Agent Mejorado's outstretched arm).

- Immigration officials were engaged in violent, aggressive conduct, including violently arresting a protestor several feet from Mr. Cerna, contributing to a tense and aggressive environment. Ex. 4 at 0:20, Ex. 7. Mr. Cerna had been aggressively shoved by another immigration official earlier that morning. Ex. 2 at 0:04-0:05.

Again, these mitigating facts do not excuse Mr. Cerna's offense but are instead intended to contextualize it within a tense, aggressive environment where both sides engaged in undesirable conduct. The government's sentencing recommendation takes none of these mitigating factors into account. Nor does it take into consideration the misdemeanor nature of the conviction – the government is advocating for the same sentence that would accompany a felony conviction.

The government's effort to rely on other activity by Mr. Cerna is unavailing. Dkt. No. 82 at 5-6. The government first cites a photograph of Mr. Cerna holding a cinder block while *walking away from agents* and then asks the Court to "presum[e ]" Mr. Cerna threw those cinder blocks at agents. But there is no evidence whatsoever that Mr. Cerna threw cinder blocks and he did not do so – it is wholly improper for the government to suggest otherwise. The government has *scoured* hours and hours of social media posts,

body worn camera, and other sources of video to bring cases arising out of the Paramount protests. If Mr. Cerna threw a cinderblock, it would have been caught on camera. The government next points out that Mr. Cerna threw a water bottle and firework – both events that occurred *after* Mr. Cerna was struck in the face by a tear case canister and after agents shot additional tear gas toward protests. *See* Dkt. No. 82 at Ex. 15 (tear gas visible). The water bottle strikes a light post and falls to the ground. *Id.* And there is no indication of whether the firework came into proximity with any federal officer. To be clear, that does not excuse these actions by Mr. Cerna. However, the Court should carefully consider the circumstances in which these events transpired, including overly aggressive conduct on the part of federal agents.

### 3. Just Punishment

No further sentence is necessary to ensure that Mr. Cerna has received a just punishment for the misdemeanor offense of simple assault. He has served seven days in custody, two months on home detention, and seven months on curfew with location monitoring. This is already a punishment far more severe than would be imposed upon first-time offenders convicted of misdemeanor assault causing no injury. If this offense had been prosecuted by the state, Mr. Cerna likely would have qualified for court-imposed mental health diversion. Cal. Penal Code § 1001.36.

20

Those are all consequences that have flowed from this case and which the Court may consider when determining the appropriate sentence. Mr. Cerna has been punished sufficiently and nothing further is needed to meet this goal of sentencing.

### 4.    Unwarranted Sentencing Disparities

While precise data is unavailable, it is intuitive that a simple assault without physical contact by a first-time offender rarely results in a custodial sentence. As mentioned earlier, had this case been filed in state court rather than federal court, Mr. Cerna would have likely qualified for mental health diversion. Cal. Penal Code § 1001.36. Federal sentencing data confirms that the eight-month sentence requested by the government is wildly out of the norm. According to the Judiciary Sentencing Information (JSIN) website, 16 defendants in the last five fiscal years had an offense level of 6 in criminal history category of I and were sentenced under USSG § 2A2.4. Eight defendants received an average sentence of one month in custody and the remaining eight received no custodial sentence. Notably, the data does not reflect whether those defendants were convicted of felonies or misdemeanors. Ex. 14.

The cases identified by the government (Dkt. No. 82 at 12) in support of its recommended sentence are readily distinguishable. *See United States v. Chacón*, No. 2:25-cr-00761-AB (defendant had a prior conviction for rape and admitted to striking official with object); *United States v. Gálvez*, No. 2:25-cr-00519-AB (defendant admitted to throwing a device that was akin to an incendiary bomb or grenade at law enforcement, offense level of 23 per PSR, two pending criminal cases, no legal status in United States); *United States v. Johnson*, No. 2:25-cr-00588-E (defendant admitted to splitting on three different federal officials, stipulated offense level of 9); *United States v. Munoz*, No. 2:25-cr-00708-MAA (Dkt. No. 51) (defendant had a *60-page* rap sheet with convictions for burglary, vandalism, simple battery, domestic violence, fighting, and mayhem); *United States v. Rodriguez,* No. 8:25-cr-00146-KES (defendant was in criminal history category IV with a Guidelines range of 21-27 months per the government); *United States v. Gustavo*, No. 2:25-cr-00424-PA-1 (defendant was in criminal history category V). In fact,

21

in one of the cases cited by the government, *United States v. Seitz*, No. 8:26-cr-00021-FWS, the defendant received a year of probation and three months' home detention for conduct substantially more aggravated than Mr. Cerna's: punching an officer in the groin while resisting arrest causing bodily injury and also damaging government property. And although the defendant's Guidelines range called for the statutory maximum sentence of 12 months' imprisonment, the government *recommended* one year of probation with a period of home detention. *See id.* at Dkt. No. 27.

Based on this data, a sentence that effectively amounts to seven days in custody and two months of home detention would not create unwarranted sentencing disparities with similarly situated defendants. The government's recommendation is excessive and unwarranted and hints at vindictiveness.

### 5.    Specific and General Deterrence

The recommended sentence also meets the need for the sentence imposed to deter Mr. Cerna and others from committing a similar offense. With respect to specific deterrence of Mr. Cerna, there is no question that his experience in the federal criminal system has unequivocally communicated to him the serious consequences that accompany any violation of federal law. He has served time in jail and on home detention. He has been strictly monitored by Pretrial Services. ██████████████████████ ███████████████████████████████████████████████████. This constellation of consequences has sent a message that would not be made more clear by additional custody or supervision time.

Further custody time is also unnecessary to deter others from engaging in similar offenses. The federal government's response to immigration protestors is well-documented. There have been numerous cases arising out of the immigration protests that occurred in Los Angeles. Mr. Cerna's sentence will not add to public understanding of the consequences of violating the law in any meaningful way. It will simply provide additional social media content for the Department of Justice and Department of Homeland Security.

22

### 6.   Protection of the Public

Finally, the recommended sentence sufficiently protects the public because Mr. Cerna does not present a danger to the public or to government officials. ████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████ On that basis, the Court may comfortably conclude that Mr. Cerna does not present any danger to the public that warrants imposing additional custody or supervisory time.

## V.   CONCLUSION

The Court should bring this case to a conclusion by sentencing Mr. Cerna to time served and a special assessment of $25.  Further supervision – whether through a term of probation or supervised release – is not necessary to meet the goals of sentencing where Mr. Cerna has been punished substantially and completed nearly nine months of onerous pretrial release without any violations whatsoever.[12]

---

[12] To the extent the Court imposes a term of probation or supervised release, Mr. Cerna agrees, and does not object, to the imposition of the term identified in this plea agreement.